Appeal No. 19-3074

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

## PATRICIA DRISCOLL,

Appellant,

v.

## UNITED STATES OF AMERICA,

Appellee.

————————————

On Appeal from the
United States District Court
For the District of Columbia
1:16-cr-00166-RJL
Hon. Richard J. Leon

————————————

# BRIEF OF APPELLANT PATRICIA DRISCOLL

————————————

Brian W. Stolarz
Fox Rothschild LLP
1030 15th Street, N.W.
Suite 380 East
Washington, D.C. 20005
(202) 794-1224
bstolarz@foxrothschild.com

*Counsel for Appellant Patricia Driscoll*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28, Appellant Patricia Driscoll hereby submits her Certificate as to Parties, Rulings, and Related Cases.

### Parties, Intervenors and Amici

The Appellant was the Defendant in the District Court in a criminal case, who was convicted after a jury trial. The Appellee is the United States of America.

There were no intervenors or *amici curiae* before the District Court, and undersigned counsel is not aware of any intervenors or *amici curiae* before this Court.

### Rulings Under Review

The Appellant seeks review of the District Court's denial of a motion for discovery prior to trial, a denial of a motion for a mistrial or in the alternative a motion to dismiss based on a *Brady* violation, the provision of multiple anti-deadlock instructions to the jury over objection, and post-trial rulings denying a motion for judgment of acquittal or motion for new trial.

*Related Cases*

This case was not previously before this or any other Court.

Undersigned counsel is not aware of any related cases.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES......................i

TABLE OF AUTHORITIES...............................................................vi

INTRODUCTION.........................................................................1

JURISDICTIONAL STATEMENT ......................................................1

STATUTES AND REGULATIONS......................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................2

STATEMENT OF THE CASE ...........................................................3

    A.    Procedural History ..................................................3

    B.    Facts Concerning Government Misconduct............................5

        1.    Ms. Driscoll's Motion for Discovery About Potential Misconduct Is Denied.....................................................6

        2.    Agent Valdini Is Identified as a Witness and the Government is "Surprised" ...........................................8

        3.    Defense Counsel Seeks Clarity on an FBI Contact with Hermanstorfer's Family Law Attorney Leading to *Brady* Revelations.......................................9

        4.    The Clandestine and Undisclosed Lunch Is Revealed ....................................................................11

        5.    The Court Is Skeptical of the Government's Sources of Information ..........................................................13

6.   The Court Proceeds on Simultaneous Tracks to Move the Trial Forward While Also Addressing the Government's Misconduct ............................................. 15

7.   Agent Valdini Testifies About His Conduct Outside the Presence of the Jury ............................................... 16

8.   The Family Law Attorneys Testify About Finch's and Agent Valdini's Presence at the Hearing and Luncheon ..................................................................... 20

9.   The Court Considers the Motion for Mistrial or Dismissal ..................................................................... 23

10.  The Court Denies the Motion for Mistrial or Dismissal ..................................................................... 27

11.  Agent Valdini Testifies at Trial and Defends His Conduct ...................................................................... 31

C.   Facts Concerning Jury Deliberations and Charge ............... 34

SUMMARY OF ARGUMENT ........................................................ 40

STANDARD OF REVIEW ............................................................. 40

ARGUMENT ................................................................................ 41

I.   The District Court Erred in Denying a Request for Pre-Trial Discovery ................................................................................. 41

II.  The District Court Erred in Not Declaring a Mistrial, Dismissal or New Trial Based on the Government's Clear Misconduct ................................................................................ 43

A.   The Court's Remedy for the Late *Brady* Production Was Insufficient for the Defense .................................................... 43

B.    Agent Valdini Directly Contradicted a Critical Finding by the Court Regarding Ms. Driscoll's Notice and His Misrepresentations Violated Ms. Driscoll's Constitutional Rights ........................................................................... 52

III.   The District Court Erred in Giving Multiple Coercive Anti-Deadlock Jury Instructions ........................................................... 57

A.    The Court Gave Two Additional Improper Instructions Which Omitted Key Language Regarding Jurors Not Abandoning Honest Convictions .......................................... 60

CONCLUSION ..................................................................................... 65

CERTIFICATE OF COMPLIANCE ........................................................... 66

CERTIFICATE OF SERVICE ................................................................... 67

# TABLE OF AUTHORITIES[1]

**<u>Cases</u>**                                                                        **<u>Page(s)</u>**

*Barbett v. United States,*
    54 A.3d 1241 (D.C. 2012) ....................................................................58

*Epperson v. United States,*
495 A.2d 1170 (D.C. 1985)..................................................... 57, 58, 60, 61

*Grant v. United States,*
    85 A.3d 90 (D.C. 2014) ......................................................................60

*Hankins v. United States,*
    3 A.3d 356 (D.C. 2010) ......................................................................60

*SEC v. ESM Government Securities Inc.,*
645 F.2d 310 (5th Cir. 1981) ................................................................55

*\*United States v. Borda,*
    848 F.3d 1044 (D.C. Cir. 2017) ............................................... 40, 44, 45

*United States v. Moore,*
    867 F.Supp.2d 150 (D.D.C. 2012) ................................................. 45, 46

*United States v. Morrow,*
    412 F.Supp.2d 146 (D.D.C. 2006) .......................................................45

*United States v. Olsen,*
    737 F.3d 625 (9th Cir. 2013).......................................................... 45, 51

*United States v. Peters,*
    153 F.3d 445 (7th Cir. 1998.......................................................... 55, 56

---

[1] Authorities upon which the Appellant chiefly relies are marked with asterisks.

*United States v. Seawell,*
    550 F.2d 1159 (9th Cir. 1977) ...................................................... 61, 62

***United States v. Thomas,**
    449 F.2d 1177 (D.C. Cir. 1971) ................................................ 57, 58, 63

*United States v. Trie,*
    21 F.Supp.2d 7 (D.D.C. 1998) .......................................................... 46

***United States v. Tweel,**
    550 F.2d 297 (5th Cir. 1977 .................................................... 54, 55, 56

*United States v. Yarborough,*
    400 F.3d 17 (D.C. Cir. 2005) ...................................................... 59, 60

*Vaughn v. United States,*
    93 A.3d 1237 (D.C. 2014) ...................................................... 45, 46, 50

## **Statutes**

28 U.S.C. §1291 ...................................................................................... 2

18 U.S.C. §1341 ................................................................................... 2, 3

18 U.S.C. §1343 ................................................................................... 2, 3

26 U.S.C. §7201 ................................................................................... 2, 3

26 U.S.C. §7212(a) .............................................................................. 2, 3

22 D.C. Code §3221(a) ........................................................................ 2, 3

22 D.C. Code §3222(a)(1) ....................................................................... 3

## INTRODUCTION

The government's reprehensible conduct in this case led to the Appellant's unjust and unconstitutional conviction.

The District Court's own words summarize the Appellant's argument:

> [T]his whole episode has a very unfavorable odor to it, it stinks. It reveals, in my judgment, a cavalier approach to serious deprivations of liberty, it's sloppy and careless. **This attitude and this approach, in my judgment, has no place in the Department of Justice**.

(JA 342-343) (emphasis added).

The jury's verdict does not absolve the government and its agents of its serious misconduct which tainted the entire investigation and prosecution. The District Court valiantly sought to remedy the government's misconduct during trial, but the damage was too great and pervasive to overcome.

In addition to the government's misconduct, the District Court propounded numerous, coercive anti-deadlock jury instructions.

## JURISDICTIONAL STATEMENT

The Appellant was convicted after a jury trial on November 29, 2018, and was sentenced by the District Court on September 12, 2019. Notice of appeal was filed on September 26, 2019.  Judgment was filed

on October 1, 2019.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1291.

## STATUTES AND REGULATIONS

The pertinent statutes in this matter include:  (1) 18 U.S.C. §1341; (2) 18 U.S.C. §1343; (3) 26 U.S.C. §7212(a); (4) 26 U.S.C. §7201; and (5) 22 D.C. Code §3221(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in denying a request for pre-trial discovery.

2. Whether the District Court erred in not declaring a mistrial, dismissal, or post-trial motion for judgment of acquittal or new trial based on the government's misconduct and *Brady* violation.

3. Whether the District Court erred in giving multiple coercive anti-deadlock jury instructions.

## STATEMENT OF THE CASE

### A.    Procedural History

The Appellant, Patricia Driscoll, the former President of the Armed Forces Foundation ("AFF"), a Washington, D.C. based non-profit organization, was indicted on seven charges, including attempt to interfere with the administration of the Internal Revenue laws (26 U.S.C. §7212(a)), two counts of wire fraud (18 U.S.C. § 1343); two counts of mail fraud (18 U.S.C. § 1341); a D.C. Code charge of first degree fraud (22 D.C. Code §§ 3221(a), 3222(a)(1)); and two counts of tax evasion (26 U.S.C. § 7201).[2]  The Court dismissed the attempt to interfere count on August 31, 2017.

Initially, this case was set for trial on October 9, 2018.  The Court delayed the trial until October 17, 2018 to conduct a five-day hearing to resolve evidentiary issues.

On November 5-6, 2018, the Court interrupted the trial to conduct an evidentiary hearing based on the government's misconduct and *Brady* violation as set forth herein. On November 8, 2018, Ms. Driscoll

---

[2] The Court's initial estimation of this case was "[t]his is a classic example of a case that's been both overcharged and is being overtried. Classic.  It will be a textbook example someday."  (JA 219).

3

moved for a mistrial or dismissal.  The Court denied the motion on November 13, 2018.

The trial concluded on November 29, 2018.  Ms. Driscoll's Rule 29 motion was granted as to two counts of mail fraud, but denied as to the remaining counts.  Ms. Driscoll was convicted of all five remaining counts.

On December 28, 2018, Ms. Driscoll filed a motion for judgment of acquittal or in the alternative for a new trial.  The Court denied the motion on April 24, 2019.

Ms. Driscoll was sentenced on September 12, 2019, to concurrent terms of one year and one day on counts 1, 2, 4, and 5 (the wire fraud counts and tax evasion counts), and 10 months on the D.C. Code count.  Ms. Driscoll was ordered to pay restitution in the amount of $154,289.  This appeal followed.  The Court ordered that Ms. Driscoll's sentence be stayed pending appeal.

### B.    Facts Concerning Government Misconduct

The facts concerning the government's misconduct are largely uncontroverted.  One month after the investigation in this case began, IRS CI Agent, Robert Valdini, attended four days of custody proceedings in Maryland, involving Ms. Driscoll's minor son, with the consent and approval of government counsel.  The agent lied about who he was to Ms. Driscoll, to her family law counsel, to the Maryland Judge who presided over the hearing and to his court personnel, and was thus able to witness Ms. Driscoll's testimony and secure numerous critical investigative leads.

On the fourth and final day of the hearing, the Agent listened to extensive bias testimony from the main whistleblower in the case, as well as a strong rebuke from the Maryland Judge to the parties, warning them against using his courtroom for a criminal investigation. Remarkably, after the hearing ended, Agent Valdini also met with Ms. Driscoll's ex-husband, Geoff Hermanstorfer ("Hermanstorfer"), his counsel, and Hermanstorfer's new wife ("Ms. Hermanstorfer") at a restaurant six miles from the courthouse during which time Hermanstorfer stated he had documents and information concerning the

investigation.  Agent Valdini wrote a Memorandum of Activity ("MOA")
for three of the four days he attended the hearing.  The final day was
never memorialized, a fact that was not addressed by government
counsel during the investigation.  This critical information was not
disclosed until the middle of trial.  These actions constitute misconduct
and require a remedy.

      1.    <u>Ms. Driscoll's Motion for Discovery About Potential
           Misconduct Is Denied</u>

Ms. Driscoll became concerned about whether civil processes,
including a civil IRS audit of AFF and the Maryland child custody
hearing, were being used to gather information for the criminal
investigation.  On April 28, 2017, a motion for discovery was filed
requesting the government to provide relevant evidence concerning
whether the civil process had been used to collect evidence that was
presented to the grand jury.  (JA 88).  The government opposed the
motion, stating that there was no parallel proceeding because the IRS
civil investigation concluded before the criminal investigation began.
(JA 129).

In reply, Ms. Driscoll stated that, based on discovery provided, it
was evident that Hermanstorfer communicated with government

representatives on at least seven different occasions. (JA 159). Furthermore, Ms. Driscoll referred to some of the more troublesome aspects of the child custody hearing – that Tanya Finch ("Finch"), a former AFF employee, Hermanstorfer's cousin, the IRS and FBI whistleblower and a critical government witness, declined to answer questions during the custody hearing based on a purported "U.S. governmental law privilege" about whether she surreptitiously removed AFF documents without permission and that the Maryland Judge presiding over the hearing precluded certain testimony about AFF's business because, "[w]e're not litigating for the purpose of assisting law enforcement. We're not litigating to smear people. We're litigating to determine custody, all right?" (JA 159-160).

Ms. Driscoll therefore requested production of all evidence "[t]o assess whether private parties acted with the intent of assisting the government's investigative efforts." (JA 161).

The government initially moved to strike the reply, (JA 172), but then responded. The government stated, bluntly and dismissively, "the defense is not entitled to any discovery." (JA 183). Ms. Driscoll filed a further reply, stating that discovery was warranted to ascertain the

7

degree of interaction between government representatives, Finch, Hermanstorfer and their counsel.  (JA 185).

The Court denied the motion during a status conference which was reflected in an August 31, 2017 minute order.  (JA 9).  The Court stated, "[b]ased on my review of the pleadings, the Court denies the defendant's motion for discovery and a possible hearing on parallel proceedings issues." (JA 199).

### 2.    Agent Valdini Is Identified as a Witness and the Government Is "Surprised"

On October 10, 2018, the Court requested that counsel list trial witnesses and a time estimate.  (JA 207-217).  Defense counsel listed Agent Valdini.  (JA 207).  Defense counsel informed the Court that Valdini was one of the primary investigators in the case, but was not being called by the government.  (JA 208).  Defense counsel stated that Valdini was being called "for discrete issues."  (JA 208).  Government counsel Cheatham responded, "[a]nd I don't know what this discrete issue is . . . . he's not a fact witness." (JA 208).  Ms. Cheatham further stated, "[o]h, Special Agent Valdini does not know why he is being called. . . . He has no idea."  (JA 209).  Defense counsel stated that he had given the government a preview of the issues previously and

informed the Court that Agent Valdini was present at a child custody

hearing concerning Ms. Driscoll's minor child.  (JA 210).  The issue had

also been raised the day before in connection with the listing of Ms.

Driscoll's family law counsel, Robert Erdmann ("Erdmann") as a trial

witness. ("Agent Valdini showed up and watched and was there

watching the very private personal custody battle and we will be

questioning him about that on direct, which is something I've put in a

pleading before.").  (JA 204-205).

The Government disclosed two MOAs prepared by Agent Valdini

at the Status Conference on August 31, 2018.  The third MOA was

disclosed on October 16, 2018, the day before jury selection began. (JA

200, 220).  The disclosure on October 16 came about because the

government agreed to accept service of a subpoena for Agent Valdini to

testify as a defense witness.  (JA 209).

    3.    <u>Defense Counsel Seeks Clarity on an FBI Contact<br>with Hermanstorfer's Family Law Attorney Leading<br>to *Brady* Revelations</u>

During trial, defense counsel examined Erdmann. (JA 223).  In

connection with that examination, counsel asked Erdmann about a

contact he had with Darin Rumer ("Rumer"), Hermstorfer's family law

attorney and Erdmann's adversary in the family law proceeding, which was memorialized in an e-mail. (JA 223). The e-mail showing this contact had been in the government's possession for approximately a month, as the Court directed an exhibit exchange in advance of trial. (JA 229).

Rumer told Erdmann that an unnamed FBI agent contacted and met him in a coffee shop or restaurant in College Park, Maryland, told him about the investigation and showed him some documents. (JA 223). Defense counsel expressed concern that the government was working with Hermanstorfer's family law counsel to provide questions or information in connection with Ms. Driscoll's testimony in the family law proceeding. (JA 224).[3]

The Court expressed immediate concern stating, "[w]ell, the FBI is engaged in contact like this, that's a red flag for me, as it would be for any Judge on this Court." (JA 225). The government's response was

---

[3] The Court stated that he wished that defense counsel had raised this issue before trial began. (JA 225). When defense counsel stated "[w]e talked about this," the Court stated, "[n]ever, this is the first time I've ever heard of this." (JA 225). The issue of coordination and communication between Hermanstorfer and his representatives with the government was raised in the May 2017 discovery motion noted herein. (JA 159).

based on hearsay: "[t]his is why we don't allow hearsay in a court of law." (JA 226). The Court responded stating, "you don't have to lecture me on why we don't allow hearsay in a court of law now. Come on." and "[t]his has nothing to do with the hearsay, per se." (JA 226).

The Court asked Ms. Cheatham if she questioned her agents regarding the contact, and she stated, "I don't know that that actually happened." The Court directed the government to inquire of the agents over the luncheon recess. (JA 227, 228). The Court also stated, "I'm very surprised and disappointed that this has been in the possession of the government for well over a month" and was not addressed. (JA 229).

4.    The Clandestine and Undisclosed Lunch is Revealed

After the recess, the government stated that neither of the two FBI agents assigned to the case met with Rumer, but that a government agent – IRS CI Agent Robert Valdini – had, in fact, done so. (JA 231).

Government counsel reported that she spoke with Agent Valdini, who revealed, ***for the first time***, that on the fourth and final day of the child custody hearing, Agent Valdini went to lunch with Rumer, Hermanstorfer, and Hermanstorfer's new wife Jessica Hermanstorfer. This was never recorded in an MOA or provided to the defense. (JA 235).

11

The government initially attempted to deflect attention away from the lunch by stating that what happened at the custody hearing was a "chance meeting," during which Agent Valdini was introduced to Rumer, Hermanstorfer, and Ms. Hermanstorfer in court at the close of the proceedings. (JA 232-235). Once the lunch was finally revealed, defense counsel noted that it "[t]ook ten minutes to get the fact that they actually had a meal." (JA 235). After that fact was disclosed, the Court asked for a sworn statement from Agent Valdini. (JA 235). The Court also expressed skepticism about what was discussed at the lunch:

> THE COURT:    Then why did he go to dinner with him for?
>
> MR. STOLARZ: They shared a meal together.
>
> THE COURT:    Talk about the Redskins?
>
> MS. CHEATHAM:    He actually said, he tried to talk about sports and politics, is what he said. That's what he told me, Your Honor.
>
> THE COURT:    Wrong.

(JA 237-238).

The government subsequently filed an opposition to Ms. Driscoll's motion for a mistrial[4] and, regarding the final day of the child custody hearing and the lack of an MOA by Agent Valdini, stated: "[h]e did not take any notes and did not prepare a memorandum for the fourth day of the hearing, ***because nothing relevant to the investigation occurred at the hearing on that day***." (JA 254) (emphasis added). The government's statement is troubling because it was false and misleading to the Court as set forth in significant detail herein.

     5.    <u>The Court Is Skeptical of the Government's Sources of Information</u>

In connection with the colloquy regarding Agent Valdini, the Court also inquired about Ms. Hermanstorfer and her contact with the government. (JA 238). The Court asked where she got her information, and the government responded, cavalierly: "I don't know. We're just accepting it. We're just getting this information in. We are not responsible for where that information came from," and also

---

[4] The government filed a lengthy opposition to the Defendant's motion for mistrial on November 2, 2018 (JA 251), but counsel did not move for a mistrial until November 8, 2018.

13

acknowledged that she had not interviewed Ms. Hermanstorfer. (JA 238-239).

The Court assumed, correctly, that Ms. Hermanstorfer (who had no connection or involvement with AFF or Frontline Defense Systems ("FDS")) received information from Finch, to which the government responded, "[t]hat may well be." (JA 239). The Court asked whether the government questioned Finch about this issue, to which the government responded, no. (JA 239-240).

Government counsel then said that Finch provided information to Hermanstorfer because she was issued a subpoena in the family law case. (JA 240). The Court stated that the subpoena to Finch was for "information that was the property of AFF," and the subpoena should not have been issued to Finch as a former employee (JA 240). The Court then stated "[t]his case is falling apart in front of your eyes, Ms. Cheatham, falling apart. Right now." (JA 241) (emphasis added). The Court then ordered a sworn statement from Finch, declaring "[t]his is ridiculous." (JA 241).

Finch provided an affidavit (JA 606) in which she recounted numerous contacts and communications with the Hermanstorfers, and

14

admitted to producing AFF documents and Ms. Driscoll's personal

documents pursuant to a subpoena issued by Hermanstorfer's attorney.

(JA 612-613).  The records included AFF American Express statements,

AFF bank statements, FDS (Ms. Driscoll's company) American Express

statements, other responsive documents pertaining to financial

transactions, e-mails, text messages and calendars. (JA 613).  The

extensive subpoena was included with her affidavit.  (JA 619-624).

> 6.  <u>The Court Proceeds on Simultaneous Tracks to
> Move the Trial Forward While Also Addressing the
> Government's Misconduct</u>

The Court decided that due to the numerous issues raised

regarding the government's conduct, it would proceed on two tracks

simultaneously, taking witness testimony for the trial and also

addressing the misconduct issues.  (JA 243).  The Court stated, "when

you're in a minefield, you don't sprint."  (JA 243).  The Court expressed

concern about the missing MOA and the lunch because Valdini would

not go to the meal and "never discuss the case, the investigation, show

them documents."  (JA 244-247).  The Court concluded by stating that

this issue "isn't about the hearsay rule.  This is about fairness. This is

about conducting the powers of the United States in a fair way vis-à-vis an individual.  That's what this is about."  (JA 250).

### 7.   Agent Valdini Testifies About His Conduct Outside the Presence of the Jury

Agent Valdini testified outside of the presence of the jury on November 5, 2018 (JA 266).  Agent Valdini stated that he saw an article regarding Ms. Driscoll on May 22, 2015 on ESPN.com.  (JA 262).  He contacted his supervisor and then contacted the United States Attorney's Office, specifically Ms. Cheatham. (JA 267).  He interviewed Finch, and she provided him with invoices, bank statements, and credit card statements.  (JA 268).  Finch informed Agent Valdini that Ms. Driscoll would be testifying in a child custody hearing, and a "team decision" was made during an in-person meeting between Agent Valdini, FBI Agent Timothy Lynch, and Ms. Cheatham for Agent Valdini to attend the hearing.  (JA 270, 292).  Agent Valdini stated that Ms. Cheatham agreed with the idea.  (JA 271).

There was no discussion of it being a covert operation, rather, Agent Valdini would go as a member of the public.  (JA 271).  He informed his supervisor he was going, but not in a covert manner.  (JA 271).

16

On the first day of the hearing, Ms. Driscoll attempted to take Agent Valdini's photograph, and subsequently she and her lawyer approached Agent Valdini in the hallway of the courthouse. (JA 272-273). They asked what he was doing at the hearing and whether he was a court employee. (JA 274). Agent Valdini said he was not a court employee. (JA 274).[5] The following day, Ms. Driscoll asked if Agent Valdini was a reporter or worked for the government, and Agent Valdini "reiterated his statement that he was a member of the public merely viewing the trial." (JA 276).[6]

When asked why he was untruthful, Agent Valdini testified that "I don't think I have any obligation to identify who I am." (JA 286).

---

[5] Agent Valdini's MOA states: "At approximately 12:10 lunch was called. During the break DRISCOLL along with Erdman approached SA Valdini in the hallway and asked what he was doing there. SA Valdini did not identify himself but stated he was observing the proceedings. DRISCOLL asked if he worked for the Court and SA Valdini responded no. This was the extent of the interaction." (JA 586).

[6] The specific statement from Agent Valdini's MOA is: "DRISCOLL approached SA Valdini and asked him what he was doing here. SA Valdini responded that he was a member of the public viewing the trial. DRISCOLL asked SA Valdini if he was a reporter or worked for the government. SA Valdini reiterated his statement, that he was a member of the public merely viewing the trial." (JA 588).

17

Agent Valdini wrote MOAs for three of the four days he attended the custody hearing. The memoranda were prepared contemporaneously with his attendance. (JA 587, 591, 594).

Agent Valdini acknowledged that Ms. Cheatham had not asked him about the MOAs and he only provided them to her several weeks before his testimony. (JA 279). He also acknowledged that he did not write an MOA for the last day of the custody hearing, but he kept a diary of his time, which was not produced. (JA 280-281).

Agent Valdini acknowledged that when Finch testified on the final day of the hearing, she invoked the "U.S. governmental law privilege" and refused to answer certain questions. (JA 281-282). Agent Valdini also acknowledged that he recalled that the presiding judge stopped Hermanstorfer's attorney from asking certain questions because they were not there to investigate people. (JA 282). Finally, Agent Valdini acknowledged that he went to lunch with Mr. and Mrs. Hermanstorfer and Rumer. (JA 283). Agent Valdini admitted this was the first time he ever had a meal with the ex-husband of the target he was investigating, and he regretted not writing up the lunch as a contact with a potential witness. (JA 285).

18

Agent Valdini acknowledged that the information he gathered while attending the custody hearing was relevant to the review of the investigation, assisted in identifying which witnesses should be interviewed, and which ones could potentially be subject to the issuance of subpoenas. (JA 277-278).[7]  He also acknowledged that at the time of the hearing, he understood 5 percent or less about the case.  (JA 280). FBI Agent Lynch also stated that "[w]e know very little at that time" about the case.  (JA 293).

The Court examined Agent Valdini, and initially asked about Finch's production of documents and whether he asked any questions about how she obtained them.  (JA 287).  Agent Valdini stated that he did not ask any questions about that, and did not inquire as to whether Finch had a non-disclosure agreement, despite the fact that he later testified that he knew she signed one.  (JA 287-288, 358).  Agent Valdini later acknowledged, however, that there was a contention that Finch took AFF documents illegally, and he did not know if there was an IRS

---

[7] Ms. Cheatham acknowledged that the agents in this case made derivative use of the information they received from the custody case. (JA 373).

19

regulation that prohibits accepting stolen documents from a company.
(JA 291).[8]

Agent Valdini also stated that Finch was coming forward because
of "what happened to Kurt Busch and that she thought that she had to
do something about it." (JA 289)[9]. Agent Valdini admitted it was his
first time testifying in a trial. (JA 290).

8. <u>The Family Law Attorneys Testify About
Finch's and Agent Valdini's Presence at the
Hearing and Luncheon</u>

The family law attorneys who were opposing counsel in the child
custody case testified outside of the presence of the jury. Darin Rumer,
Hermanstorfer's attorney, testified that he received information and
documents from Finch in connection with the child custody case. (JA

---

[8] During the defense's case, evidence was presented that Finch was also
being investigated for theft, specifically a laptop, and $20,000. A
warrant for Finch's arrest was prepared and delivered to the United
States Attorney's Office, specifically Ms. Cheatham, and after the
assigned Detective spoke with FBI Agent Lynch, the investigation of
Finch was "put on a back burner." Finch was never arrested. (JA 375).
The government did not cross-examine the detective who provided this
information.

[9] Ms. Driscoll was in a relationship with Mr. Busch who assaulted her
in a domestic violence incident. (JA 289). Ms. Driscoll pressed charges.
(JA 289). Finch befriended Mr. Busch and sought to help him by
making allegations against Ms. Driscoll.

295).  However, he denied that he ever received a copy of Finch's FBI whistleblower complaint from Finch or her counsel.  (JA 296).  Rumer was confronted with the fact that one of his pleadings in the child custody case, a motion to strike Erdmann's appearance, contained a section of allegations against Ms. Driscoll which was an exact cut and paste from Finch's FBI whistleblower complaint.  (JA 296-297).  Rumer denied that it was a cut and paste, stating that the only information he received from Finch's counsel was by phone, and he could have gotten the information from Lexis or Westlaw, a statement the Court did not credit:  "[i]t's just simply not credible, what he said."  (JA 298, 311-312). The Court also questioned whether Rumer's conduct and allegations against Erdmann and Ms. Driscoll were meant to try to gain an advantage in the custody case.

This exchange left unanswered where Rumer received a copy of the FBI whistleblower complaint and provided further context to the contact he had with Erdmann regarding the FBI meeting.

With respect to Agent Valdini, Rumer recalled that "Judge Bernhardt (the Maryland presiding Judge) kept inquiring as to who he was and why he was in the courtroom."  (JA 300).  Rumer recalled the

21

Judge asking Agent Valdini "***several times***."  (JA 300) (emphasis

added).  Agent Valdini always answered "I'm a member of the public."

(JA 300).  Rumer recalled that Judge Bernhardt was "perturbed at why

he was there and wanted to know a little bit more information.  I think

at one point, he even sent bailiffs out to ask what he was doing."  (JA

300).  Rumer did not understand that Agent Valdini was a government

agent until the hearing concluded and they went to lunch together.  (JA

301).

Erdmann testified that he recalled asking Agent Valdini who he

was.  Valdini said he was a reporter.  (JA 305).  Erdmann also recalled

that the Maryland Judge wanted to know who he was and asked his

bailiff to find out.  (JA 306).

Erdmann recalled that Rumer informed him of the FBI contact

and where the contact occurred.  (JA 303-304, 310).  Critically,

Erdmann testified that at the time of the custody hearing, he did not

believe Ms. Driscoll was doing anything wrong.  Specifically "*there was*

*nothing on my radar or presented in the case that indicated Ms. Driscoll*

*was doing anything nefarious*."  (JA 306-307) (emphasis added).

Furthermore, Erdmann did not believe the things Rumer told him

regarding an FBI investigation of Ms. Driscoll.  (JA 307)  Also,

Erdmann did not credit the motion Rumer filed to remove him from the

case.  It contained many allegations against Erdmann and Ms. Driscoll,

which he believed were false and being used for litigation leverage.  The

motion was denied by the Court.  (JA 307-308, 310).

> 9.    The Court Considers the Motion for Mistrial or
>        Dismissal

In discussing the witness testimony, the Court credited

Erdmann's testimony about what he was told by Rumer.  (JA 312).  The

Court also acknowledged the high-profile nature of the case and Agent

Valdini's motivation:  "[o]h yeah, this is the big white whale.  Everyone

wants the big white whale. . . . This is *Moby Dick*."  (JA 314).

The Court also stated that, "I've heard enough already to know

that the Judge in this case was concerned about what was happening in

his courtroom," and made a pronouncement about not using his court

for law enforcement purposes on the final day of the hearing, the day

Agent Valdini did not write an MOA.  (JA 315-316).

Furthermore, the Court understood the gravity of this issue on the

administration of justice:

> If Valdini had told the truth on day one or two, the Judge
> would have been in a better positon, with Valdini in the
> courtroom, to shut it off sooner. But he didn't make that
> decision, in part, shutting it off sooner, because he didn't
> know that an IRS agent was sitting there taking notes, and
> the Judge was, in effect, crippled by the false statement of
> Valdini in this situation.  (JA 316).
> Defense counsel also noted that the Maryland Judge was

precluded from advising Ms. Driscoll of her rights.  The Court stated,

"[s]o there's at least two things that the falsity of Valdini's statement

impacted negatively, just in the Judge's role."  (JA 316).  Furthermore,

the Court previously stated that "[a]t a minimum, at an absolute

minimum, her lawyer needed to know it so he could properly counsel

her under the circumstances, at a minimum, that's at a minimum."  (JA

249).

The Court continued, stating that "[t]he Judge's ability to make

sure that the proceeding wasn't going too far astray in a way that was

unfair to the parties, in particular Ms. Driscoll, and to make sure that

no witness, in particular Ms. Driscoll, said anything, in the presence of

a criminal investigator, that might warrant or necessitate some kind of

criminal defense counsel."  (JA 316-317).  Finally, the Court noted that

he was a Justice Department prosecutor three times, and "there are

times where their failure to identify themselves, or even worse,

misrepresent themselves, can have collateral negative consequences on fairness and justice. (JA 317). The Court previously said that when he worked at the Department of Justice for three and a half years, he "never once heard of an IRS investigator during my time in the Tax Division, lying." (JA 247-248).

The Court then stated, "***I think it smells. I feel like I am in a dump somewhere.*** . . . I don't like what's happening here at all." (JA 319) (emphasis added).

With respect to Agent Valdini and his misrepresentations, Ms. Rakoczy stated that "Special Agent Valdini remembered the Bailiff asking him, he didn't remember anything about the Bailiff saying, the Judge wants to know who you are." (JA 320). The government admitted that it could not find a controlling regulation on whether Agent Valdini was required to identify himself to Ms. Driscoll. (JA 321).

The Court stated, "I'm trying to understand why he thought it was the right and fair thing to do, prudent thing to do, to lie. I don't understand it." (JA 322). The Court also noted that Agent Valdini is himself a lawyer, and it was "very troubling" because his lie is

25

"depriving the Judge of that knowledge, which could affect the way the Judge runs the case and the proceeding." (JA 323).

The Court expressed concern about the impact of the case, stating:

> I'm also -- what I'm also concerned about is allowing a precedent to exist that reinforces, or doesn't punish adequately, unacceptable behavior, and doesn't discourage unacceptable behavior in the future. So I've got to weigh that against, you know, doing what is fair to the government. But it won't shock you to hear me tell you that, as far as I'm concerned, Valdini's conduct, not only in the courthouse in Howard County, but in failing, either intentionally or unintentional, to do a memorandum of action on the fourth day's events, and particularly his meeting with the Hermanstorfer family and Mr. Rumer, is totally unacceptable. In another day, another era he would have been reassigned by his superiors at IRS to Butte, Montana; he would have been gone.

(JA 324-325).

Ms. Rakoczy then stated that because of Agent Valdini's inexperience, "Ms. Cheatham and I will speak to Agent Valdini after this case." (JA 326). Defense counsel scoffed at this remedy, stating that the concept of deterrence is used all the time in sentencing, "[b]ut yet here today, we're talking about, well, after the trial, Ms. Cheatham will give Agent Valdini a good talking to. Next time, don't do that. That can't be the remedy. . . . [s]o deterrence cannot just be that he'll learn a lesson. That he's an inexperienced guy. Next time he will do

26

better.  Because she's been under indictment for two years and her life

has been torn apart by this."  (JA 328).

> 10.  <u>The Court Denies the Motion for Mistrial</u>
> <u>or Dismissal</u>

On November 13, 2018, the Court ruled on the motion for mistrial

or dismissal.  (JA 329).  The Court made several findings:  (1) Ms.

Cheatham authorized Agent Valdini to attend the child custody

hearing, a fact which was previously unknown to the Court; (2) Agent

Valdini misrepresented himself on at least three different occasions, to

the presiding judge by way of court staff, and to Ms. Driscoll herself on

two other occasions, facts which were also previously unknown to the

Court; and (3) Agent Valdini did not take notes or memorialize his

observations on the fourth and final day of the child custody hearing, a

fact which was also previously unknown to the Court, and "Special

Agent Valdini provided no credible explanation for this omission." (JA

330-331).  The Court further held that Valdini's explanation for why he

did not take notes regarding the final day – because it was irrelevant to

the investigation – "strains credulity."  (JA 332).

The Court noted that on the fourth day, the day for which Agent

Valdini did not prepare an MOA, principal witness Finch was subject to

cross-examination twice, invoked the "U.S. governmental law privilege," and the Maryland Judge acknowledged Finch's "obvious bias." He stated, "I understand that she's got biases. She's the first cousin of the plaintiff and, in an extremely acrimonious proceeding, she has admitted taking documents that she was precluded from taking under her non-disclosure agreement and doing it surreptitiously and hiding them." (JA 334). Finally, the Court noted that the Maryland Judge rebuked Rumer "for treating a child custody dispute as if it were a Grand Jury proceeding." (JA 334).

The Court then stated "[t]ruth to tell, the Court has a sneaking suspicion as to why Valdini's notes and memorandum are nowhere to be found. The fourth day of the Howard County proceedings raise serious questions both about Ms. Finch's bias and about the use of those proceedings by Finch and Hermanstorfer to develop against Ms. Driscoll." (JA 335). The Court then noted the lunch Agent Valdini had with the Hermanstorfers and Rumer. (JA 335-336).

The Court held that Agent Valdini joined the lunch at the Hermanstorfer's behest, "and because Hermanstorfer offered to provide information about potential criminal behavior by his ex-wife, Ms.

28

Driscoll." (JA 335). The Court then referenced both Agent Valdini and

Ms. Cheatham's conduct:

> More troubling, perhaps, Special Agent Valdini appears to
> have no qualms in exploiting this family feud to further his
> criminal investigation and, worst of all, to doing so without
> reporting it to the lead prosecutor, Ms. Cheatham.
>
> By the same token, Ms. Cheatham's apparent ignorance
> about such facts in her own investigation is, well, let's just
> say, inexcusable. She authorized Valdini to attend those four
> days of hearings. She missed the fact that Valdini made no
> record of his fourth day, which is, frankly, incredible to the
> Court. ***These facts raise larger questions of how the
> government has conducted and supervised this
> investigation.***

(JA 337) (emphasis added).

Nevertheless, the Court denied the motion for mistrial or

dismissal, stating that regarding Ms. Driscoll's constitutional rights and

Agent Valdini's inducing her to waive those rights by lying to her, she

was aware that she was under criminal investigation due to the May

22, 2015 ESPN.com article. (JA 338).

With respect to the *Brady* violation, the Court held that there was

sufficient evidence to show that exculpatory evidence was not disclosed,

but did not find prejudice to Ms. Driscoll, albeit the question was a

"close one." (JA 340). The Court held that although the information

was disclosed "at the eleventh hour," Ms. Driscoll's case-in-chief had not yet begun, and therefore she would be able to use the evidence. (JA 341). The court further stated that he would give counsel "a wide berth" to examine witnesses based on the newly discovered evidence. (JA 341).

The Court concluded, however, by stating, "[n]otwithstanding that ruling, no one should in any way believe that how the government has acted in this case, in this Court's judgment, is proper. To the contrary, Special Agent Valdini's misadventures and the prosecutor's lack of investigation about their own investigation, give this Court great concern." (JA 342). The Court then stated:

> [T]his whole episode has a very unfavorable odor to it, it stinks. It reveals, in my judgment, a cavalier approach to serious deprivations of liberty, it's sloppy and careless. ***This attitude and this approach, in my judgment, has no place in the Department of Justice***.

(JA 343) (emphasis added). The Court concluded by stating, "[w]hen this case is over, this Court will make the appropriate referrals to people in positions of authority, with the appropriate sections of the transcript, so that they can evaluate what to do in response to the conduct of the government and its agents in this case." (JA 343). The record does not reflect whether such referrals were made.

30

11.  <u>Agent Valdini Testifies at Trial and Defends</u>
     <u>His Conduct</u>

Agent Valdini testified during Ms. Driscoll's case-in-chief.  (JA 344-346).  Agent Valdini acknowledged that he saw the ESPN.com article regarding Ms. Driscoll and sought out the case.  (JA 347-348).  He also acknowledged that he attended all four days of Ms. Driscoll's child custody case, and heard intimate personal details about family-related issues including holidays and extracurricular activities.  (JA 349-350).

Agent Valdini stated that Ms. Cheatham knew he was going to the hearing and agreed with him attending.  (JA 351).  Agent Valdini also admitted to being untruthful, and defended his conduct by asserting that he was doing "limited cover" to preserve the integrity of his surveillance, discussed such surveillance with Ms. Cheatham, and had approval from his supervisor.  (JA 351-352, 361).  Agent Valdini also admitted to attending the lunch with the Hermanstorfers and their attorney in which the Hermanstorfers stated that they had "documents, information to provide."  (JA 354-355).

With respect to Ms. Finch and her gathering of AFF records, Agent Valdini stated that it was his understanding that "when she was

working there, she emailed herself documents" but did not have permission to email them to herself and she was subject to a non-disclosure agreement with FDS.  (JA 356, 358).  He recalled that the Maryland Judge made a comment that Finch was a very biased witness.  (JA 357).  He acknowledged that despite the fact that Finch testified on the final day and he also attended the lunch, he did not write an MOA for that day of the custody hearing.  (JA 359-360).

Agent Valdini also stated that he spoke with Ms. Cheatham the week after the hearing about what occurred.  (JA 353, 360, 362).

The Court then examined Agent Valdini.  When asked why he did not tell Ms. Driscoll who he was, he stated, "I'm not under any obligation to identify myself in that situation."  (JA 363).  Agent Valdini also denied that any court staff approached him and asked who he was.  (JA 364).  The Court continued to probe as to why he had been untruthful to Ms. Driscoll, and then Agent Valdini stated his reasoning:

> THE COURT: And your biggest concern was if they knew you were an IRS agent, they either wouldn't testify or they wouldn't tell the truth when they testified; is that about it?
>
> THE WITNESS: My biggest concern was that the nature of the investigation at that point was covert, *I did not want it to be overt, for Ms. Driscoll to know that we were investigating her yet*."

32

(JA 365) (emphasis added).  The Court stated that because it was publicly known that an IRS whistleblower complaint had been filed, there was no need for covert operations.  Agent Valdini responded, "[w]ell they didn't know that I was the one that was investigating, that [FBI] Special Agent Lynch was investigating."  (JA 365).

After Agent Valdini was excused, the Court asked Ms. Cheatham whether she was informed of the events of the fourth day, and she responded, "[h]e told me about some events, yes."  (JA 366).  However, she declined knowing about the lunch on the final day of the hearing. (JA 366).  She admitted that "[w]e talked about the testimony."  (JA 366).  She also stated that she asked Agent Valdini for his memoranda for all of the days; he provided two in August 2018 and one in October 2018, "[a]nd eventually he told us no, there was no more."  (JA 367).  It is unclear when that final exchange occurred.

The Court then asked whether Ms. Cheatham took notes of her conversation with Agent Valdini about the fourth day, and she said yes. (JA 367-368).  She was ordered to produce the notes, and did so the following day.  (JA 370).  The notes showed a communication regarding the hearing but did not reflect a lunch meeting.  The Court proposed a

stipulation that Agent Valdini did not report the luncheon to Ms.
Cheatham.  (JA 371-372).

The trial proceeded and the defense rested on November 15, 2018
(JA 20).  The final point made by the Court regarding Agent Valdini
was in its denial of Ms. Driscoll's post-trial motions:  "Special Agent
Valdini's conduct was far from exemplary in this case."  (JA 629).

### C.    Facts Concerning Jury Deliberations and Charge

Jury deliberations began on November 20, 2018.  Within two
hours of deliberations, the jury sent a note stating, "We have one person
that has his mind made up and will not change his mind.  What do we
do?" (JA 379).

In response, the Court stated that this development was
"disappointing" and "I'm going to have to give them kind of a Big
Brother, Dutch uncle kind of talk here."  (JA 382).  The Court then
stated he would reaffirm a prior instruction, 2.501, "Attitude and
conduct of jurors in deliberations," and "then, just to put a little
garnishment on the dinner – or lunch, I should say, I'll read 2.601, anti-
deadlock instruction, *Thomas* instruction."  (JA 382-383).

The government opposed reading an anti-deadlock instruction, stating, "[i]t's just not there yet." (JA 383-385). When the Court asked what words were harmful to give from the *Thomas* instruction, the government stated "[a]ll of them, because if the Court gives it now, the Court can't give it later." (JA 385). The Court responded: "[o]f course I can, I can give it as many times as I want" and reaffirmed that what he was giving was a *Thomas* instruction. (JA 385). The government continued to object, and the Court stated that it would strike the title of "anti-deadlock instruction and just put *Thomas* instruction." (JA 385-387).

The Court re-read instruction 2.501, and then issued the following *Thomas* instruction to the jury:[10]

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to the verdict; in other words, your verdict must be unanimous. It's your duty as jurors to consult with one another. It's you duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only -- only -- after an impartial consideration of the evidence with your

---

[10] Red Book Instruction 2.601 (III)(A). Although the Court did not read the heading of "anti-deadlock instruction" the Court read the instruction in its entirety with the additional words so this was a *Thomas* instruction.

fellow jurors. In the course of your deliberations, do not hesitate -- do not hesitate -- to reexamine your own views and change your opinion if convinced that it is erroneous. But do not surrender honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Ladies and gentlemen, you are not partisans, you are judges, judges of the facts. Your sole interest should be to reach a just verdict from the evidence in this case, okay? So I think the thoughts and the sentiments expressed in those two instructions, I think, give you guidance to the question that has been raised. And like I say, you have one of them right in there with you, 2.510, you can always refer back to it. And we all appreciate that this isn't easy, this is hard work, going through evidence and going through the charges, we appreciate that and we thank you for that. And we'll thank you more than once for that because we know it's not easy. **<u>But it is really important, really important to the parties and to the community, to the country</u>**. So I encourage you to – the spirit and the words I've just read to you, to listen to them and adhere to them.

(JA 389-390) (emphasis added).

Defense counsel objected to the additional language.  (JA 391).

On November 27, 2018 the jury returned another note that stated "one juror is not following the judges rules.  He already has his mind made up, and he is not basing his decision on the facts. Is it possible to request an alternate juror?"  (JA 393).

Defense counsel stated, "[i]f it's the same juror as yesterday, I do think an individual voir dire of that witness – of that juror is required."

(JA 397). The government requested that the foreperson be questioned about why the juror was not following the Court's instructions. (JA 398). Defense counsel then stated that it deferred to the Court as to how to handle the matter and the order in which the individual juror and the foreperson would be questioned. (JA 398-399).

Government counsel noted that the Court could not give a second anti-deadlock instruction: "[a]nd just to reiterate what I said yesterday, Your Honor, the Court having already given that instruction, the Court cannot give it again. It's our view that that was the anti-deadlock instruction, and the Court is not allowed to read the same instruction again." (JA 400).

The Court did not question either the individual juror or the foreperson. Rather, the Court addressed the jury and referred to the prior day's *Thomas* instruction: "[w]ell, yesterday I gave you instructions, follow-up instructions to deal with, a note that has some similarities to this note, and I stand by that. . . . And I think I addressed the issue as to the necessary spirit and approach that each juror must take as it relates to deliberations, and I stand by that." (JA 401).

37

The Court continued:

> I hope, and I hope time will show, that whichever juror this is,
> that he or she will embrace the spirit and the language that I
> read yesterday and will come around to keeping an open mind
> and discussing with the other jurors their position as it
> relates to the facts that they believe have been proven in this
> case.  (JA 401-402).

Defense counsel objected to the instruction, specifically the reference to "coming around to keeping an open mind" and also objected to the Court's failure to also instruct the jury that, although they should keep an open mind, they should also maintain their honest convictions in connection with their deliberations.  (JA 402-404, 405-406).  The Court stated, "I just simply encouraged them to follow yesterday's instructions, the spirit and letter of those instructions."  (JA 404).  Defense counsel stated that notwithstanding the Court's intent, the "functional effect" of the instruction turned into a second *Thomas* instruction.  (JA 407-408).  The Court ended the day with another reference to "keep[ing] an open mind."  (JA 410).

Deliberations continued on November 28, 2018, and the jury sent another note, which stated that they agreed on three counts but were "deadlocked" on two.  (JA 411).

The government asked the Court to take a partial verdict and not give a further anti-deadlock instruction.  Defense counsel asked the Court to take a partial verdict, and declare a mistrial on the remaining counts.  (JA 414-416).  The government did not oppose the defense's request for a mistrial on the remaining counts.  (JA 419).

The Court did not take the partial verdict but, rather, read Red Book instruction 2.601 (I) ("Initial Instruction to Jury That Indicates it Cannot Agree").  (JA 417-418):

> Okay. So in a situation like this, ladies and gentlemen, where you've indicated you're unable to reach a unanimous decision at this time, the Court has to make a judgment as to whether or not to end your deliberations or not. It's my judgment that you've been deliberating approximately 16 hours in total, which, in my judgment, is not unusual in cases such as this, with the amount of documents there are here and the amount of witnesses there were in this particular case. As a result, I'm going to ask you to continue deliberations in this case tomorrow. **Keep an open mind about the case**, with a view of listening to others and expressing your own point of view, to see whether you can reach unanimity on these other two counts. You'll profit from having a nice rest, I'm sure, and get a little relaxation away from the case, and you can gather your thoughts. **But keep an open mind**. And tomorrow morning, I will provide you – not knowing that you had reached unanimity today, I have not yet provided you the verdict form. But I will have a verdict form for you tomorrow morning that I'll provide to your foreperson, and you'll have that for your deliberations tomorrow. . . .

> So get some rest, **<u>keep an open mind</u>**, don't share your thoughts at this point with anyone other than your fellow jurors when all of you are in that jury room together.

(JA 420-421) (emphasis added).

After just over one hour of deliberations the following morning, the jury found Ms. Driscoll guilty on all five counts.

### SUMMARY OF ARGUMENT

The Appellant presents three issues for review. First, the District Court erred in denying the Appellant's motion for discovery regarding the government contact issues in this case. Second, the District Court erred in not dismissing the case, declaring a mistrial, or ordering a judgment of acquittal or new trial based on the government misconduct and *Brady* violation. Finally, the District Court erred in giving multiple, coercive anti-deadlock instructions.

### STANDARD OF REVIEW

The standard of review for the discovery issue is abuse of discretion. The government misconduct and breach of its *Brady* obligations is a question of law that is reviewed *de novo*. *United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir. 2017). The jury instruction issue is reviewed for abuse of discretion.

40

## ARGUMENT

## I.    The District Court Erred in Denying a Request for Pre-Trial Discovery

Ms. Driscoll sought, in good faith and well in advance of the trial, to uncover the government's misconduct which was ultimately revealed at trial. Despite these efforts, the government opposed them and the Court denied them.

In *May 2017*, Ms. Driscoll sought discovery on communications between Finch, Hermanstorfer, their counsel and the government, and Agent Valdini's attendance at the custody hearing. (JA 153). Despite the fact that the Agent Valdini completed his MOAs contemporaneously with his attendance at the hearing in June 2015, government counsel did not inquire about or produce them in response to the May 2017 motion. Rather, the government blithely responded to the motion for discovery by stating "the defense is not entitled to any discovery." (JA 183).

To further the injustice, the government did not produce two of Agent Valdini's memoranda until August 31, 2018, and the third one until October 16, 2018, the day before jury selection began. The government stated that it produced these memoranda only because the

41

defense sought to call Agent Valdini in its case at trial, not because of the clear *Brady* information contained therein.  The final injustice occurred when Agent Valdini revealed that he did not write a memorandum about the fourth day even though Ms. Cheatham was aware that he attended all four days.

Ms. Driscoll tried to do the right thing by seeking discovery regarding issues about which the government was fully aware, including its initial consent for Agent Valdini to attend the custody hearing.  In response, the government stated, "the defense is not entitled to any discovery," and did not produce the MOAs in its possession or control until it was too late for the defense to use.  The Court should have ordered discovery on this issue, or, as set forth in Section II, should have declared a mistrial, dismissal or new trial once it discovered the full spectrum of the government's misconduct in this case.

## II.    The District Court Erred in Not Declaring a Mistrial, Dismissal or New Trial Based on the Government's Clear Misconduct

The actions of the government and its agents in this case raise serious concerns about the investigation and prosecution of Ms. Driscoll.

Ms. Driscoll is entitled to relief in this case because of the improper conduct of IRS CI Agent Valdini, Ms. Cheatham, and the *Brady* issue which was uncovered during the in-trial evidentiary hearing.  The Court valiantly attempted to remedy the misconduct, but this case was already poisoned to its core.  In the final analysis, it is truly sad and disappointing.  No remedy by the Court could have combatted the prejudice to Ms. Driscoll other than a mistrial or dismissal.

### A.    The Court's Remedy for the Late *Brady* Production Was Insufficient for the Defense

Regarding its motion for mistrial or dismissal, the Court outlined four critical facts discovered in the mid-trial evidentiary hearing.  First, Ms. Cheatham consented to Agent Valdini's attendance at Ms. Driscoll's child custody hearing.  Second, Agent Valdini misrepresented his identity to Ms. Driscoll, her counsel, the court, and its staff.  Third,

43

Agent Valdini did not write an MOA on the date Finch testified to document the serious issues of bias that she had towards Ms. Driscoll, including her invocation of a non-existent "US governmental law privilege" and the Maryland Judge's scolding of the parties regarding using his courtroom for the investigation.  Finally, the Court found that Agent Valdini attended the post-hearing lunch but did not write an MOA regarding that lunch, and Ms. Cheatham did not know about the lunch.  The Court made its ruling and remedy based on these facts.

To prove a *Brady* violation, Ms. Driscoll must demonstrate three elements:  (1) favorable evidence, either as impeachment or exculpatory evidence; (2) suppression by the government; and (3) prejudice.  *United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir. 2017).  To satisfy the prejudice element, the evidence must be material.  *Id*.  Evidence is material if there is a "reasonable probability" that the result of the trial would have been different had the evidence been admitted and used properly, leading to "undermin[ing] confidence in the outcome" of the trial.  *Id*.  Significantly, *Borda* held that when examining reasonable probability, "the Court must not view the evidence in isolation, but rather must consider the nondisclosure 'dynamically' and take into

account the numerous predictable impacts the evidence could have on trial strategy." *Id.* at 1067 (citation omitted). *See United States v. Olsen*, 737 F.3d 625, 633 (9th Cir. 2013) ("[b]y now government prosecutors should know: Betray *Brady*, give short shrift to *Giglio*, and you will lose your ill-gotten conviction.") (dissenting op.).

Remarkably, the government sought to hide behind the Jencks Act as to why they did not turn over the information: "Rob Valdini is not our witness, we didn't have to provide them with information about – under the James [sic] Act." (JA 238). *Brady* material is not confined to only those witnesses the government plans to call at trial, and this statement reflects the government's overall attitude towards fairness in this case. *See Borda*, 848 F.3d at 1066 (the evidence must be "favorable to the accused, *either* as impeachment or exculpatory evidence") (emphasis added; citations omitted).

*Brady* disclosure in this Circuit must be done "in sufficient time for the defendant to use the favorable material effectively in the preparation and presentation of [his or her] case." *United States v. Moore*, 867 F.Supp.2d 150, 151-52 (D.D.C. 2012) (*citing United States v. Morrow*, 412 F.Supp.2d 146, 158 (D.D.C. 2006)); *see also Vaughn v.*

45

*United States*, 93 A.3d 1237, 1260 (D.C. 2014) (analyzing "the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made") (citation omitted). *Moore* held that the ordinary remedy for a late disclosure violation before trial is a continuance, and a mistrial is the remedy for *Brady* violations that cannot be cured by a continuance. *Moore*, 867 F.Supp.2d at 152.

"*Brady* does not tolerate 'the government's failure to turn over an easily turned rock,'" and for important witnesses closely tied to the investigation, the "government should have [had the] systems in place to ensure that it was alerted immediately about impeaching information." *Vaughn*, 93 A.3d at 1258 (citations omitted); *United States v. Trie*, 21 F.Supp.2d 7, 26 (D.D.C. 1998) (holding that the government has the "affirmative duty to resolve doubtful questions in favor of disclosure," and that "if the sword of Damocles is hanging over the head of one of the two parties, it is hanging over the head of the [government]" (citation omitted)).

One of the critical issues for which defense counsel did not have adequate time to prepare was Agent Valdini's revelation that he discussed the child custody case with Ms. Cheatham and his supervisor

and purportedly received "verbal" consent to conduct "surveillance" of Ms. Driscoll.  No operational plans were provided nor was there any evidence to support the contention.  Defense counsel did not know that the custody case had been discussed with government counsel or a supervisory agent.  Defense counsel could not use this information when it was provided because no discovery had been conducted on the issue and Agent Valdini was able to conveniently "hide" behind discussions about "limited surveillance" with a heretofore undisclosed supervisor which had the sheen of credibility to the jury, all in an attempt to minimize or lessen the impact of Agent Valdini's overall conduct.

Had the information been provided when requested in May 2017, the information about the lack of an MOA on the fourth day and Agent Valdini's overall conduct would have surfaced long before the middle of trial, and Ms. Driscoll would not have been forced to accept whatever testimony Agent Valdini provided.  More investigation could have been done, for example, on whether the DOJ Tax Division was aware of Agent

Valdini's conduct when it provided approval to the U.S. Attorney's Office to include Title 26 charges.[11]

Additionally, Agent Valdini was not truthful in his testimony and defense counsel had no choice but to accept it given the late disclosure. One of the most significant facts which concerned the District Court was that the Maryland Judge and court staff inquired as to Agent Valdini's identity and he told them he was a member of the public.  Had the Maryland Judge known a law enforcement officer was in the courtroom, he could have sealed the court room or the judge could have permitted Ms. Driscoll to consult with criminal counsel before she testified.

The Court specifically credited the testimony of the opposing family law counsel, both of whom recalled the Judge and staff inquiring of Agent Valdini.  Everyone in this case agreed this inquiry occurred, although outside the presence of the jury.  Critically, Ms. Rakoczy stated that "***Special Agent Valdini remembered the Bailiff asking***

---

[11] According to information provided by the government, the DOJ Tax Division provided approval on August 6, 2015.  (JA 262).

***him***, he didn't remember anything about the Bailiff saying, the Judge wants to know who you are." (JA 320) (emphasis added).

But Agent Valdini told the jury he had no interaction with anyone from the Maryland Court. In response questioning by both defense counsel and the Court, Agent Valdini denied being approached by Court staff, and stated in response to this Court's questioning that "[n]o one from the Court staff ever approached me." (JA 364). Agent Valdini further stated "[a]nd I don't recall ever being approached by anyone other than Ms. Driscoll or Mr. Erdmann." (JA 364).

This discrepancy is troubling and is contrary to one of the District Court's findings. The government informed the Court outside the presence of the jury that the Bailiff approached Agent Valdini, but in front of the jury Agent Valdini denied such contact twice. Notably, Ms. Rakoczy did not remind Agent Valdini of his prior recollection she reported to the Court during her examination, so Agent Valdini's untruthful testimony remained before the jury.

This exchange illustrates the limited impact of the Court's remedy. Even though the Court gave defense counsel a "wide berth," Agent Valdini was untruthful and, given the timing of the disclosure, the

49

defense could not disprove his testimony. The Court must have been aware of the remedy and its limitation when it *sua sponte* questioned Agent Valdini, stating "[t]here's testimony that someone [from the court staff approached him] did in this case," and asked him to "think hard" and "pause and reflect" about it. (JA 364).

However, this examination would only have had power if the jury heard the testimony of others to corroborate that Agent Valdini was not truthful, and the fact that the Court credited that testimony of those who stated that the Agent was asked who he was by court personnel. Without the full picture, the jury may have concluded Agent Valdini told the truth to the Court. At a minimum, the jury had to be confused. This exchange demonstrates that the Court's remedy was insufficient. *See Vaughn*, 93 A.3d at 1260 (stating, "[t]he defense had no means of challenging these responses, much less any basis to ask the Court for more leeway in impeaching Officer Childs with his prior false reporting.").

It is clear that Agent Valdini, a relatively new IRS CI Agent who had never testified in Court, wanted to work on the "white whale" case early in his career, and wanted to get a conviction rather than serve

justice. When such conduct is combined with a prosecutor who is briefed about some of the events of the fourth day but does not inquire about an MOA for that day until after trial begins, justice suffers.

It is also pure luck and happenstance that the fourth day lunch and Valdini's failure to draft an MOA was uncovered, since it was the result of a separate, independent e-mail suggesting government misconduct. *See Olsen*, 737 F.3d 625, 630 (stating that because *Brady* violations seldom come to light, "[t]his creates a serious moral hazard for those prosecutors who are more interested in winning a conviction than serving justice."). Defense counsel should not have to toil like a truffle pig rooting around the files because the government did not heed its duties.

Despite the Court's best efforts, its remedy for the *Brady* violation was insufficient. The defense played by the rules by flagging this issue well in advance of trial, but the government did not play by the same rules. This was error. *See Olsen*, 737 F.3d at 632 ("[w]hen a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the

51

rule of law.  When such transgressions are acknowledged yet forgiven

by the Courts, we endorse and invite their repetition.").

**B.**     **Agent Valdini Directly Contradicted a Critical**
           **Finding by the Court Regarding Ms. Driscoll's Notice**
           **and His Misrepresentations Violated Ms. Driscoll's**
           **Constitutional Rights**

Agent Valdini's trial testimony also contradicted the conclusion the

Court made about Ms. Driscoll being on notice of the investigation.  The

Court believed Ms. Driscoll was on notice of the criminal investigation

when an ESPN.com article was published (sourced by Finch whose clear

motive was to protect Kurt Busch and smear Ms. Driscoll) regarding

alleged financial issues at AFF.  However, Erdmann testified that the

allegations were false and he did not believe Ms. Driscoll had done

anything wrong at the time he counseled her to testify. (JA 306-307,

310).

Additionally, Agent Valdini admitted that he misrepresented his

identity to Ms. Driscoll and the court because he did not want to put her

on notice and he did not reference the ESPN.com article in the

exchange:  "[m]y biggest concern was that the nature of the

investigation at that point was covert, ***I did not want it to be overt,***

***for Ms. Driscoll to know that we were investigating her yet***." (JA 365) (emphasis added).

The ESPN.com article did not function as notice, and Agent Valdini contradicted the Court's conclusion because he believed Ms. Driscoll was not on notice when she testified at the custody hearing and did not want her to know who he was. The article did not state that Ms. Driscoll was under criminal investigation by the FBI, and was a speculative and biased article intended to get views on the internet because of Ms. Driscoll's former relationship with Mr. Busch. The Court placed too much credence in the ESPN.com article and did not place it in proper context. It could appear to be adequate notice after a multi-year investigation and multi-week trial, but it had to be judged based on Ms. Driscoll's state of mind and the status of the Maryland custody case at the time the article was published. The Court had such evidence – Ms. Driscoll's family law counsel, who said he did not believe she had committed any misconduct, and the motion to strike his appearance in a very acrimonious proceeding was denied by the Maryland Court. Both had the same source as the ESPN.com article – Finch. The Court's post-hoc view cannot supersede the real-time evidence presented.

This conduct remains squarely in line with the government's conduct in *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977).   In *Tweel*, the defendant was convicted of conspiring to defraud the United States, two counts of tax evasion and two counts of making false statements in a tax return.  *Id.* at 298.  An IRS agent informed Tweel and his wife that he had been assigned to audit their federal income tax returns and asked for an appointment.  *Id.*  During an earlier audit for a different time-frame, a special agent of the IRS Intelligence Division became involved but withdrew, and the audit remained civil instead of criminal.  *Id.*  Tweel's accountant asked whether a "special agent" was involved in the new audit and the revenue agent replied that no special agent was involved.  *Id.*  Therefore, Tweel complied with the audit. *Id.* The audit was, in fact, being conducted at the specific request of the Organized Crime and Racketeering Section of the DOJ.  *Id.*

The Court held that "the agent's failure to apprise the [defendant] of the obvious criminal nature of the investigation was a sneaky deliberate deception by the agent under the above standard and a flagrant disregard for appellant's rights."  *Id.* at 299.  The Court further held that "[t]he silent misrepresentation was both intentionally

54

misleading and material." *Id*. The Court stated that "Miller [the IRS

Agent's] response, although on the face of it true, misled appellant to

such a degree that his consent to the 'search' must be vitiated by the

agent's silence concerning the origin of this investigation." *Id*.

Furthermore, the Court concluded:

> [w]e cannot condone this shocking conduct by the IRS. Our
> revenue system is based upon the good faith of the taxpayers
> and the taxpayers should be able to expect the same from
> the government in its enforcement and collection activities.

*Id*. at 300.

*United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998) (holding that

"[a] consensual search is unreasonable under the Fourth Amendment or

violative of the due process under the Fifth Amendment if the consent

was induced by fraud, deceit, trickery or misrepresentation by the

revenue agent."). The *Peters* Court held that the defendant must

"establish that the agents affirmatively misled her as to the true nature

of their investigation and that this affirmative misleading was a

material factor in her decision to give information to the agents." *Id*. at

456. Finally, in *SEC v. ESM Government Securities Inc.*, 645 F.2d 310,

316 (5th Cir. 1981) the Court held that "[w]e believe that a private

person has the right to expect that the government, when acting in its own name, will behave honorably."

Although this case does not involve a suppression motion or a statement directly to a government agent, the *Tweel* and *Peters* analyses hold.  Agent Valdini's deception led Ms. Driscoll to unknowingly waive one of her constitutional rights, which was Agent Valdini's goal in appearing and not identifying himself, as he admitted to the Court.

This conduct cannot be condoned.  The taint in this case was impossible to undo, as it began one month after the investigation started, a time when the lead IRS agent understood 5 percent or less of what the case was about.  Ms. Driscoll was a "sitting duck" and Agent Valdini had his "big white whale" case primed, courtesy of his own misconduct.  Indeed, government counsel stated that when Agent Valdini witnessed Ms. Driscoll's testimony, "[c]ertainly, Ms. Driscoll's statements, we did not, her own take on what her salary was or what commissions . . . so that's information the government did not have." (JA 263).  This information is critical.  The government knew what Ms.

Driscoll's "own take" would be, and it could manage its investigation in such a way to defeat those defenses.

The government's misconduct in this case remains serious and, despite the anticipated defenses raised in its opposition, it is sad and disheartening. This Court has to do what the District Court seemed close to doing but did not – sanction improper government conduct.

## III. The District Court Erred in Giving Multiple Coercive Ant-Deadlock Jury Instructions

The District Court committed several errors in its instructions to the jury. The court improperly flipped the order of deliberation instructions from the Red Book, deviated from the language of the *Thomas* anti-deadlock instruction and did not inquire into the nature of the jury deadlock before giving the instruction which had an inevitable coercive effect and moved the lone holdout juror to convict.

This circuit developed the *Thomas* instruction to replace the "*Allen* charge" to instruct deadlocked juries. *See United States v. Thomas*, 449 F.2d 1177, 1186 (D.C. Cir. 1971) ("[W]e are persuaded, too, by the volume and complexity of litigation generated by the *Allen* charge, that its continued unrestricted use is incompatible with sound judicial administration.); *see also Epperson v. United States*, 495 A.2d 1170, 1173

57

(D.C. 1985) ("These instructions all came into existence in relation to the nationwide movement of courts to abandon the so-called 'dynamite charge' known as the *Allen* charge, and were designed as substitutes for the *Allen* charge.). *Thomas* held that "[a]ny undue intrusion by the trial judge into this exclusive province of the jury is error of the first magnitude." *Thomas*, 449 F.2d at 1181.

Anti-deadlock instructions should not be given routinely. They must be issued after consideration of the "'nature and complexity of the trial issues, the duration of the trial and the length of the jury deliberations, as well as the representations of the jury to the court about the state of its deliberations." *Barbett v. United States*, 54 A.3d 1241, 1246–47 (D.C. 2012) (quoting *Epperson*, 495 A.2d at 1172).

In this case, the Court did not inquire into the nature of the deadlock before it issued the altered instruction. The Court then skipped over Red Book instruction 2.601(I) entitled, "Initial Instruction to Jury that Indicates It Cannot Agree" and jumped straight to the *Thomas* instruction (Red Book instruction 2.601 (III)(A)) after the first jury note stated one juror had made up his mind after only two hours of deliberations.

58

The Court also deviated from the *Thomas* instruction when it inserted additional language into the instruction, specifically "[b]ut it is really important, really important to the parties and to the community, to the country."  (JA 389-390).

Such language is a deviation from the prescribed language in the standard *Thomas* instruction.  Raising the issue of duty to country and the community gave the jury the perspective that its duty was to convict to support the government and thus the country.

This circuit is very clear that "[a]ny substantial departure from the language approved in *Thomas* is 'presumptively coercive.'"  *United States v. Yarborough*, 400 F.3d 17, 21 (D.C. Cir. 2005).  This Court created these instructions to put an end to the "'uncertainties of gauging various *Allen*-type renditions in terms of the coerciveness of their impact'" because "[w]hen each judge freely devises his or her own variations on the same theme, this causes a 'drain on appellate resources' as the 'inevitable aberrations' inevitably precipitate more and more appeals.'"  *Id.* (citation omitted).  In *Yarborough*, the judge deviated from the *Thomas* instruction after a day of deliberations from

59

a four-hour trial, and after the judge inquired into the nature of the

deadlock.  *Id.* at 19-20.

### A.  The Court Gave Two Additional Improper Instructions Which Omitted Key Language Regarding Jurors Not Abandoning Honest Convictions

The supplemental instructions to the jury after the *Thomas*

instruction were also error.  In *Epperson*, the court stated, "[i]t is

elementary that a defendant is entitled to a jury in disagreement."

*Epperson*, 495 A.2d at 1172-74.  A judge risks coercion when giving an

instruction under circumstances which create a risk of coercion or

which risk forcing a juror to "'to abandon his [or her] honest conviction

as a pure accommodation to the majority of jurors or the court.'"

*Hankins v. United States*, 3 A.3d 356, 362 (D.C. 2010) (citation

omitted).  "The court should not tell the jury that agreement is

desirable or that its job is to reach a verdict.  It must temper any such

message it does convey to that effect with a clear indication that any

verdict they reach must not come at the expense of any juror's honest

convictions."  *Grant v. United States*, 85 A.3d 90, 100 (D.C. 2014).

In this case, the Court did not properly inquire into the nature of

the deadlock and proceeded to issue two additional anti-deadlock

instructions without the complete language regarding a juror's ability to hold honestly-held convictions.  These repeated instructions coerced the lone holdout juror to move on three charges and eventually pushed that same juror into a unanimous verdict.  *Epperson*, 495 A.2d 1170, 1176 (stating, "[b]arring exceptional circumstances . . . repeatedly confronting a genuinely 'hung jury' with instructions which most objective observers regard as 'anti-deadlock' instructions may endanger the integrity of a jury verdict"); *see also United States v. Seawell*, 550 F.2d 1159, 1163 (9th Cir. 1977) ("[r]epetition of the charge, together with rejection of the jury's second report of deadlock, is almost certain to convey the thought that by failing to come to an agreement – by once again reporting themselves at an impasse – the jurors have acted contrary to the earlier instruction as that instruction was properly understood. . . . [g]iven a second time, not at the request of the jury but at the instance of the judge, the charge no longer serves as an instruction; no matter how it may be softened it becomes a lecture sounding in reproof.").  The Court in *Seawell* stated, "as a sound rule of practice it is reversible error to repeat an *Allen* charge in a federal prosecution in this circuit after a jury has reported itself deadlocked

61

and has not itself requested a repetition of the instruction." *Seawell*,

550 F.2d at 1163.

This case involved complex concepts that would normally take

time to decipher.  But the Court permitted the government's misconduct

to be evaluated by the jury.  While the first deadlock note was issued

before the jurors received the exhibits, the holdout juror may have made

up his mind based on the government conduct.  The court made no

attempt to ascertain the nature of the deadlock and assumed the lone

juror just wanted to go home.[12]

The next day the jury issued a second note, again proclaiming that

one juror had made up his mind, and the foreperson requested an

alternate juror.  (JA 393).  Even the government warned the Court that

it could not give multiple anti-deadlock instructions.

The jury did not have a copy of the *Thomas* instruction that had

been given on the previous day and thus had no document for reference

---

[12] "THE COURT: I mean, to put it quite candidly, Mr. Stolarz, there's probably one person on that juror -- there may be more than one -- who thinks that if they could just hang this thing up, it will be a mistrial, he or she will get to go home early. They don't want to do the hard work, I'm sad to say -- the parties have worked very hard to put a case on for five weeks. There's lots of evidence, and there was lots of testimony. And now it's the jury's time to do their hard -- roll up their sleeves and do the hard work. And, frankly, I'd like to put it to them that bluntly; but I'm afraid that if I did so, that it might be viewed by the Court of Appeals as being too strong."  (JA 388).

regarding the importance of not surrendering honest convictions. The language "keep an open mind" does not imply that jurors should stick to their honest convictions. In fact, it may imply the opposite. Even if the Court did not intend to give a second *Thomas* instruction, the instruction that was given became the functional equivalent of such an instruction, but without the critical complete language regarding a juror holding to honestly-formed convictions. *Thomas*, 449 F.2d at 1184 (holding that "[w]e have no doubt whatever that the judge acted out of the best of motives, and that any coercion of the jury was entirely unintended. The events transpiring, however, invoke our responsibility to appraise the activities complained of, not by the good intentions behind them, but in terms of their probable impact upon the jury.").

Unsurprisingly, the second instruction moved the lone juror. On November 28, 2018, the jury issued a note stating that three charges were unanimous and two were deadlocked. (JA 411) Both parties requested a partial verdict, and the defense moved for a mistrial to which the government did not object. For the third time, the government reiterated that the court could not issue multiple anti-deadlock instructions. Yet the Court decided to issue a third instruction,

the initial Instruction 2.601, and then added three references to keeping an open mind without any references to not surrendering honest convictions.

Critically, because the order of the Red Book instructions were flipped, the jury was actually given a *Thomas* instruction, followed by the initial instruction, which specifically refers to reaching unanimity. That language is very coercive to a juror who previously held out through two *Thomas* instructions.

This Circuit cautions against the coercive effect of one anti-deadlock instruction. This Court issued *three* separate instructions, none of which conformed to the standard language. These instructions were coercive based on their reversed order, language and the number of times they were given. This requires relief.

<u>CONCLUSION</u>

For all the foregoing reasons, this Court should reverse the

District Court as set forth herein.


Dated:  December 30, 2019                Respectfully submitted,


                                         By: */s/ Brian W. Stolarz*

                                         Brian W. Stolarz
                                         (D.C. Fed. Bar No. 466160)
                                         Fox Rothschild LLP
                                         1030 15th Street, N.W.
                                         Suite 380 East
                                         Washington, DC 20005
                                         Telephone: (202) 794-1224
                                         bstolarz@foxrothschild.com
                                         **Counsel for Appellant**

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 12,931 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Century Schoolbook font.

/s/ Brian W. Stolarz
Brian W. Stolarz

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document, filed through the

CM/ECF system on December 30, 2019, will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing.


/s/ Brian W. Stolarz
Brian W. Stolarz